560

ANATOLE CARON, INC. & a.

*v.*

MANCHESTER FEDERAL SAVINGS & LOAN ASSOCIATION, & a.

*Maurice A. Broderick* (by brief and orally), for the plaintiffs.

*Samuel A. Margolis* and *George A. Wagner* (*Mr. Margolis* orally), for the Manchester Federal Savings & Loan Association.

BRANCH, J. The provisions of the statute of liens here involved are as follows:

"12. BUILDINGS, ETC. If any person shall, by himself or others, perform labor or furnish materials to the amount of fifteen dollars or more for erecting or repairing a house or other building or appurtenances, or for building any dam, canal, sluiceway, well or bridge, other than for a municipality, by virtue of a contract with the owner thereof, he shall have a lien on any materials so furnished and on said structure, and on any right of the owner to the lot of land on which it stands.

"19. DURATION. The lien created by sections 12 to 17 inclusive shall continue for ninety days after the services are performed, or the materials, supplies or other things are furnished, unless payment therefor is previously made, and shall take precedence of all prior claims except liens on account of taxes." P. L., c. 217, ss. 12, 19.

From the language of section 12, above quoted, it is plain that the lien thereby provided may attach to three different things: 1, to any materials furnished for the erection or repair of a building, 2, to the structure to which they become a part, and 3, to "any right of the owner to the lot of land on which it stands."

In the present case no attempt has been made by the plaintiffs to differentiate between their claims against the building in question, the labor and materials which went into it and the right of the owner to the lot on which it stands. The case has been argued upon the apparent assumption that the only question of importance here involved is the issue of priority between the claims of the plaintiffs and those of the defendant, hereinafter called the bank, as mortgagee. The claims of the three plaintiffs do not all stand upon the same footing and require separate consideration.

It appears from the evidence that the plaintiff Caron commenced the work of remodeling the house in question under a contract with the owner early in September, about Labor Day, 1933, and his lien upon the property therefore attached at that time. The property was then subject to the bank's original mortgage for $3200 and Caron's lien was then subordinate thereto. In this situation the bank, upon September 25, took a new mortgage upon the property for $5200 and discharged its prior mortgage. Unless, for some adequate reason, equity does not follow the law in this instance, the effect of this transaction was to give Caron a first lien upon the property for the amount of his claim.

As the basis of its conclusion that equity requires the substitution of the new mortgage in the place of the defendant's prior mortgage to the extent of $3200, the trial court states that "The plaintiffs cannot be harmed by the substitution of a new mortgage in the sum of $3200 for the former one." If the plaintiff Caron were seeking to defeat the legal rights of the bank upon some theory of equity, this consideration might be of importance in determining whether he was entitled to equitable relief, but since Caron is standing upon his legal rights and the bank is seeking equitable relief against the results of its own conduct, it is not perceived how this fact can be relied upon to justify the intervention of a court of equity in its behalf. The decision in this case must depend upon the strength of the bank's claim to equitable relief and not upon any supposed weakness in the equitable position of the plaintiff.

As to the remaining $2000 represented by the new mortgage, the fact that this amount was used to pay Caron, Inc., a portion of the contract price for the labor and materials furnished by it to Mrs. Groulx, does not in itself constitute an equitable reason why the bank's debt should have preference over the lien of Caron, and the importance which appears to have been attached to that fact is not understood by this court.

It has been argued that "presumptively," or "in equity," the first mortgage debt of $3200 has not been paid and that the fact of nonpayment furnishes an equitable reason why that mortgage should be treated as still in force despite its discharge of record.

One answer to this argument is that the trial judge, sitting as a court of equity, has found specifically that $3200 of the proceeds of the new mortgage were used "to pay and discharge a former mortgage between the same parties." The argument that, in equity, the first mortgage debt has not been paid, cannot stand in the face

of this finding unless it is to be assumed that the trial judge did not understand the purport of the language which he used.

In regard to the presumption of non-payment, it is true that extremely broad language is to be found in our cases. Thus in *Stantons* v. *Thompson*, (1870) 49 N. H. 272, 279, we read: "it is no matter whether the parties through ignorance of such intervening title, or through inadvertence, actually discharged the mortgage, and canceled the notes, and really intended to extinguish them; still on its being made to appear that such intervening title existed, the law would presume conclusively that the mortgagee could not have intended to postpone his mortgage to the subsequent title."

In this quotation it is easy to recognize one of the discredited thought patterns and the outmoded language of a much older generation. The conception of a conclusive presumption of law regarding the intention with which an act was done has no place in the jurisprudence of the present day. If, in such a case, there is any presumption at all as to the actor's intention, it must be regarded at most as an inference of fact which may be rebutted. In the later case of *Laconia Savings Bank* v. *Vittum*, 71 N. H. 465, 466, it was so treated and the above language, although quoted in the opinion, was not applied in the decision of the case. In the present case it is plain from the above quoted finding that the trial court did not see fit to draw from the conduct of the parties the inference of non-payment and it must be concluded that any presumption of fact that the defendant intended to keep the first mortgage in force was adequately rebutted by the testimony (a conclusion which is fully confirmed by an examination of the record) unless the words "to pay" are to be construed as meaning "not to pay."

The final answer to the argument now under consideration, however, is to be found in the maxim that "Where the equities are equal the law will prevail." 10 R. C. L. Tit. Equity, s. 135. If it be assumed that the first mortgage debt to the defendant has not been paid, it is equally true that the plaintiff Caron, Inc. has not been paid for the labor and materials which it furnished in making improvements upon the mortgaged property. The equities arising from the fact of non-payment alone are equal:—unless indeed the plaintiff Caron is entitled to greater consideration because of the fact that the bank's security has been enhanced in value by reason of the work which he did upon it. Under these circumstances it follows that since the plaintiff Caron now holds the legal title to the property, he should prevail unless it can be shown that the bank parted with

the security which it held under circumstances which entitle it to equitable relief. The question whether justice requires that a discharged mortgage be kept alive must be decided in each case in accordance with the established facts, as indicated by the contrasting results reached in *Holt* v. *Baker*, 58 N. H. 276 and *Buchanan* v. *Balkum*, 60 N. H. 406.

Cases in which mortgages have been revived and enforced after their discharge of record are fairly common in this jurisdiction, and they all appear to rest upon the well settled principle that "When a new mortgage is substituted in ignorance of an intervening lien, the mortgage released through mistake may be restored in equity and given its original priority as a lien." 1 Jones, Mortgages, *s.* 971, quoted in *Laconia Savings Bank* v. *Vittum*, 71 N. H. 465.

In *Hammond* v. *Barker*, 61 N. H. 53, "None of the Hammonds knew that the Dunbar Street property was under attachment" at the time when they discharged their first mortgage. *Ib.* 55. In *Laconia Savings Bank* v. *Vittum, supra,* "The bank had no knowledge of the mortgages held by Mattoon and Busiel." (second mortgages) *Ib.* 465. In *Fifield* v. *Mayer*, 79 N. H. 82, the debtor represented "that upon the application of the money thus secured in payment of the claims of Kelly, the land would be clear of all incumbrances; in other words, that the mortgage he proposed to give them would be a first mortgage." *Ib.* 84. As hereinafter shown, no comparable factors of ignorance or deceit are present in the case at bar.

In *International Trust Company* v. *Company*, 70 N. H. 118, the first mortgage was discharged because the legality of the bonds which it secured had been questioned and the new mortgage was issued in substitution therefor. The court held that the transaction should be "given the effect intended by the parties thereto" since "the attaching creditors have not done or omitted to do any act relying upon the recorded discharge." *Ib.*, 119. This case, therefore, stands for the proposition that where the acts of the parties are not legally effective to accomplish the result which they intended, equity may intervene to correct the mistake and produce the intended result when the rights of third parties will not be affected thereby. In the present case, as hereinafter shown, there is no indication that the parties intended their acts to have any results other than those which would normally follow from them by operation of law.

In *Rossiter* v. *Sanaghiaro*, 78 N. H. 484, the discharge of a first mortgage was treated as an assignment to a subsequent mortgagee who furnished the money to pay it off, and the mortgage debt was

given precedence over intervening liens upon the theory that the lien holders would otherwise be enriched at the expense of the mortgagee. If, in this opinion, the court intended to invoke the doctrine of unjust enrichment as a basis of its decision, as it apparently did, its conclusion cannot be sustained. The mere fact that a creditor, by the use of legal process or otherwise, secures the payment of a debt and thereby depletes the estate of the debtor to such an extent that other creditors cannot be paid does not, in itself, constitute an unjust enrichment and in the absence of a bankruptcy statute, the less fortunate creditors are entitled to no relief either at law or in equity. If the result in the *Sanaghiaro* case can be defended, it must be upon the theory that at the time the new mortgage was given, the parties intended to substitute it in place of the mortgage then outstanding, as in the case of *International Trust Company* v. *Company, supra.*

In the opinion of a minority of the court the following considerations lead to the conclusion that the action of the bank in discharging its original mortgage was not the result of mistake and that "the justice of the case" does not require that the lien judgment of the plaintiff Caron, Inc. should be postponed to the defendant's subsequent mortgage, "nor that a prior mortgage, discharged on the record should be revived." *Holt* v. *Baker*, 58 N. H. 276, 278.

At the time when the new mortgage was taken and the first mortgage discharged, the bank was clearly chargeable with knowledge that Caron had commenced work upon the premises and that his lien thereon had already attached. The evidence permits of no other conclusion and the motion of the plaintiff for a finding to this effect should have been granted. *Cheshire Provident Inst.* v. *Stone*, 52 N. H. 365. There is, therefore, no basis for the conclusion to which the court attached great importance in the case of *Fifield* v. *Mayer*, 79 N. H. 82, that the first mortgage was discharged "upon the mistaken idea that no other incumbrance existed." *Ib.*, 86. No attempt was made to have Caron sign a waiver of lien, although the bank's vice-president testified as follows: "As a matter of fact, we have had a lot of dealing with Mr. Caron and advanced him a lot of money. In cases where there is any question on the first payment, we always have him sign a waiver of lien. But in this particular case, because the $2000 was talked and he understood the $2000 was all he was going to have, he didn't sign a waiver of lien, which he told me later he would sign if I asked him to."

The reason why the bank departed from its usual custom and failed to secure a waiver of lien although chargeable with notice that

it had attached, is to be found in the details of the transaction which resulted in the giving of the second mortgage. The new loan was secured not only by the mortgage, but by the pledge of 21 shares of the stock of American Telephone & Telegraph Company standing in the name of one Caroline Richardson, who also signed the mortgage note, apparently as an accommodation maker. The vice-president of the bank testified that at the time this stock was pledged, it was worth at least $2100 and there is no evidence that it has decreased in value since that date. It thus appears that the additional loan of $2000 which was included in the new mortgage, was fully secured by the pledge of additional collateral. No additional money was advanced upon the security of the real estate although the bank clearly understood that the additional $2000 and $1600 more was to be expended in improvements upon it and hence that the value of its security would be increased to the extent of the value of the alterations which the plaintiff Caron had contracted to make. As a result of this transaction the bank was in a fair way to obtain an enhancement of the security for its outstanding loan of $3200 to Mrs. Groulx without extending further credit to her, since the additional amount of $2000 was fully secured by the pledge of additional collateral from another source. Under these circumstances the bank was apparently content to take the new mortgage without securing a release of Caron's outstanding lien.

There is nothing in the details of this transaction to suggest the inference that the officers of the bank were unsophisticated or in need of protection from the results of their own indiscretions. They were fully cognizant of the factual and legal elements of the situation with which they were dealing. They well understood that Caron was to receive the full amount of $2000 represented by the additional loan, and the amount for which the property could be held under his lien would, therefore, be only the amount by which his bill for alterations exceeded $2000. As to this amount the bank was apparently content to "take a chance" and we see no reason why it should now be relieved from the consequences of its voluntary act performed with full knowledge of the circumstances and of its legal rights.

As the Supreme Court of Massachusetts said with reference to another unwise mortgagee, "The position he finds himself in is one of his own choosing, and taken with full knowledge of all the facts, and he is not entitled to the relief he seeks." *Childs* v. *Stoddard*, 130 Mass. 110, 112. These words accurately describe the position of the bank in the present case.

In accordance with the foregoing discussion a minority of the court feel that the judgment of the plaintiff Caron, Inc. takes precedence over the mortgage of the bank. This conclusion is not unprecedented. *Easton* v. *Brown,* 170 Mass. 311, 314; *Kittredge* v. *Newman,* 26 N. J. Eq. 195.

A majority of the court are of the opinion, however, that a decree for the plaintiff cannot be entered upon the present record and that the case should be recommitted for further finding of fact as to the terms of understanding between Caron and the bank at the time the second mortgage was given.

The plaintiffs Bryson and Manseau are not so favorably situated. They did not commence work until after the new mortgage had been given. Consequently their liens are subordinate thereto.

*Case discharged.*